AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO
SEP 3 2019
MITCHELL R. ELFERS
CLERK

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Nuu Smart Phone
Black

Case No. 19-MR-1051

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Nuu Smart Phone, Black
located at 5441 Watson Road S.E., Albuquerque, NM 87106 see attachment A MM

located in the ______ District of New Mexico, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC § 1203 | Hostage Taking |
| 8 USC § 1324 (a)(1)(A)(v)(ii) | Aiding and abetting the transport or harboring of aliens. |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Marcus L. Moulton, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/3/19

[signature]
*Judge's signature*

City and state: Albuquerque, New Mexico

Laura Fashing, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Marcus L. Moulton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations, hereinafter referred to as HSI, and have been employed by HSI as such since December 2018. I am currently assigned to the HSI office in Albuquerque, NM where I am assigned to investigate individuals involved in immigration violations of Title 8, United States Code, Section 1324 and Title, 18, United States Code, Section 1203.

3. I successfully completed the Criminal Investigator Training Program and Homeland Security Investigations Special Agent Training at the Federal Law Enforcement Training Center (FLETC) in Brunswick, GA, where I trained in the investigation and enforcement of violations of Titles 18 and 8, United States Code. I hold a Bachelor of Science degree in Political Science from Oklahoma State University and an Interdisciplinary Master of Arts with an emphasis in International Relations from the University of Oklahoma.

4. I have also acquired knowledge and information about such offenses, and the various means and methods by which they are furthered from numerous sources, including formal and informal training from other law enforcement officers, investigators, and Special Agents; interviews of informants and arrestees; and interviews of other knowledgeable individuals.

5. Based on my training, and experience of fellow Agents, I am familiar with matters including, but not limited to, the means and methods used by persons that smuggle and harbor aliens into the U.S. and how they attempt to hide their criminal activity.

a. Human smugglers often keep names, phone numbers, addresses, email addresses, photographs, and other identifying information of their partners and others in their smuggling organization in the electronic memory of their cellular telephones and personal computers.

b. Human smugglers will often keep photographs and other identifying information for the smuggled aliens in the electronic memory of their cellular telephones and personal computers.

c. Human smugglers often maintain communications with their partners and others in their organization using text messaging for ease of communication, sending and

receiving directions to stash houses, and to avoid undue scrutiny from outside influences, often storing this information in the electronic memory of their cellular telephones and personal computers.

d. Human smugglers will often send videos and other electronic media of smuggled aliens to partners and others in their organization, storing this information in the electronic memory of their cellular telephones and personal computers.

e. Human smugglers will often use cellular devices to navigate to addresses in order to pick up and drop off smuggled aliens, with this information stored in the electronic memory of their cellular telephones and personal computers.

f. Human smugglers will often use third-party communication applications (e.g. WhatsApp, KiK, etc.) to conduct their communications with their partners or others in their organization, with this information stored in the electronic memory of their cellular telephones and personal computers.

g. Human smugglers will often use wire transfers to send and receive payment for activities, business that can be conducted on mobile electronic devices and information that is stored in the electronic memory of their cellular telephones and personal computers.

6. This affidavit is based upon information I have gained from my investigation, my personal observations, training and experience, as well as upon information related to me by other individuals, including law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation but have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence relating to violation of Title 8, United States Code, Section 1324 are stored on the Device. Based upon the following information, there is probable cause to believe that currently located within the above-described Device there is evidence of violations of Title 8, United States Code, Section 1324 as more particularly described in Attachment B.

## STATUTORY BACKGROUND

7. Title 8, United States Code § 1324(a)(1) makes it a criminal offense to harbor or transport, or conspire to harbor or transport, aliens who came to, entered, or remained in the United States in violation of law:

**(A)** Any person who—

**(i)** knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

**(ii)** knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

**(iii)** knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

**(iv)** encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

**(v)**

**(I)** engages in any conspiracy to commit any of the preceding acts, or

**(II)** aids or abets the commission of any of the preceding acts,

shall be punished as provided in subparagraph (B).

8. Title 18, United States Code, § 1203 makes it a crime to seize or detain and threaten to kill another person in order to compel a third party to do any act as an explicit condition for release:

**(a)** Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

**(b)**
**(1)** It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—
**(A)** the offender or the person seized or detained is a national of the United States;

**(B)** the offender is found in the United States; or

**(C)** the governmental organization sought to be compelled is the Government of the United States.

**(2)** It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

9. The specific items property to be searched are as follows:

NUU Smart Phone, Black

These items will be hereinafter referred to as "the Device." The Device is currently located at 5441 WATSON DRIVE SE, ALBUQUERQUE, NM 87106.
The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10. On August 5, 2019, at approximately 1700 hours, Albuquerque Police Department (APD) was dispatched to a residence located at 6413 Esther Ave NE, Albuquerque, NM 87109, about a welfare check. According to the APD report, an Officer from Carrollton Police Department in Texas requested the welfare check for Rigoberto Fuentes after receiving a call from Rigoberto's sister. The sister apparently received a text message from an unknown female requesting payment of four thousand dollars ($4,000) for Rigoberto to be transported safely to Dallas, Texas. This sister advised Officers that Rigoberto was being held against his will in Albuquerque, NM. Carrollton Police Department then "pinged" Rigoberto's phone to the Esther address and notified APD.

11. APD Officers drove to the residence, and upon arrival identified a male named David Quintana who exited the front door. Quintana was advised by APF regarding the nature of the call and requested if they could look in the home. According to the APD report, Quintana let them in the home. Upon entry, APD officers noted they encountered a Hispanic female dressed in black. The female was a Spanish speaker and identified as Idalia C. An APD Officer spoke with Idalia C. who told the Officer that she was being held against her will. Idalia C. told APD that she was also in the ride share transport, in a gray van from California to Texas. Idalia also had the same details of payment as Rigoberto's family.

12. On this same date, Carrollton Police again "pinged" Rigoberto's phone and discovered it to be at a local hotel located at 4441 Osuna Road NE, Albuquerque, NM. APD Officers drove to the location and saw a gray colored Dodge van. Officers made contact with a nervous Ramiro PEREZ, year of birth 1982, who was standing out on the balcony of the hotel. APD Officers questioned him about the allegation of persons held against their will. PEREZ told APD Officers that he was traveling with a group of individuals and they were resting for the night. According to the report, the room they were staying in was number 265. Officers entered the room and located five (5) men, one of whom was Rigoberto. APD then contacted United States Customs and Border Protection Officer Brian Knoll who took over the investigation.

13. On August 6, 2019, at approximately 0100 hours, Patrol Agent Brian Knoll responded to the scene and determined the individuals to be illegally present in the United States. All of the illegal aliens were then transported to the United States Border Patrol Office in Albuquerque, NM and processed. Special Agents Steven Lopez and Marcus Moulton responded to the Border Patrol Station and interviewed the driver Ramiro PEREZ. Special Agent Lopez

advised PEREZ of his constitutional Miranda Warning, of which he stated he understood and agreed to speak with investigators. PEREZ admitted to investigators that he was transporting the illegal aliens from Los Angeles, California to Houston, Texas. PEREZ stated that the load of aliens was arranged by a person only known as "EL GUERO." PEREZ stated that on the way to Texas he received a call and was told to pick up two (2) more people in Albuquerque at the aforementioned Esther address. According to PEREZ, he advised that when he arrived at the Esther address another vehicle parked behind him blocking his vehicle. PEREZ stated that he was escorted into the house and then a Hispanic male brandished a gun and pointed it at him. PEREZ stated the male, along with other males, then put him on the ground and taped his arms behind his back. PEREZ stated they held him at gunpoint. PEREZ stated the illegal aliens were then brought into the house. PEREZ told investigators that the captors took a phone from one of the aliens and forced the aliens to call family members on that phone in an attempt to extort up to four thousand dollars ($4,000) from each family member as a condition of release. PEREZ also stated that the captors put the pistol to the illegal aliens' heads, forcing them to make these calls. This was corroborated through interviews with the illegal aliens, who stated that the captors would not only place the aliens on the floor, but would also place their foot on the alien's heads to hold them on the ground, place the cellular phone on the floor, and hold the pistol to the aliens' heads while they were making telephone calls. PEREZ stated that he was told to help interpret for the aliens as the captors were not fluent in Spanish. PEREZ stated that one of the female aliens was suspected by the captors of being an undercover agent. According to PEREZ, the captors told this female alien to call her family member and ask for more money. The female later identified as Idalia called her sister, who told the captors that she was going to call the police. According to PEREZ, the captors then ordered PEREZ to help one of them take the aliens' baggage to a hotel. A short time later, they returned and took the aliens to the Studio 6 Motel and put them into room numbers 356 and 358. According to PEREZ, the aliens were told to continue calling their family members, that the girl from earlier had been killed, and that if they did not get their family to pay the ransom they would also be killed.

14. On August 6, 2019, HSI conducted a Search Warrant on the house the illegal aliens were originally held in, and made an arrest of Eric ARELLANO, who was identified as one of the males who took part in the capture of the illegal aliens from PEREZ.

15. During the execution of the Search Warrant, Agents conducted field interviews of ARELLANO and Sunshine Romero-Wight, ARELLANO's girlfriend. During the interview, ARELLANO repeatedly denied having a cellular phone, saying it was lost and stolen. During the field interview of Romero, Agents asked Romero to call ARELLANO's phone, which she voluntarily did, and the Device began to ring. The Device was hidden between cushions in the couch of Room D, the living room, of 6413 Esther Ave NE, Albuquerque, NM. The caller ID on the phone listed "Sunshine".

16. During the interview of ARELLANO, ARELLANO stated that he had previously arranged two (2) to three (3) alien smuggling ventures with an unknown female. ARELLANO also stated that he arranged with the same unknown female to receive the group of illegal aliens

on August 5, 2019, and that ARELLANO had made those arrangements a few days prior via cellular phone.

17. During interviews with the aliens held at the hotel, numerous aliens stated that ARELLANO took photos of them and the other aliens on his cellular phone.

18. During her interview, Romero stated that ARELLANO's cellular device is a key piece of evidence in the development of the case.

**TECHNICAL TERMS**

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Computer hardware: Equipment which can collect, analyze, create, display, convert, store conceal, or transmit electronic, magnetic optical or similar impulses or data. Hardware includes, but is not limited to; data processing devices

(desktop computers, file servers, memory typewriters, laptop or notebook computers), internal and external peripheral storage devices and their associated drives (fixed disks, hard disks, floppy disks tape drives, optical drives, CD-ROMS, DVD disks, and other memory storage devices), peripheral input/output devices (keyboards, printers, scanners, plotters, video display monitors, and optical readers), communication devices (modems, cables and connections), recording equipment, memory calculators, pagers, personal data assistants such as Palm computers, as well as any devices, mechanisms, or parts that can be used to restrict access to computers (physical locks, "card" keys, keys).

d. Computer Software: Digital information or a set of instructions that can be interpreted by a computer and any of its components to direct the way they work. Software is stored in electronic, magnetic optical or other digital form. It commonly includes programs to run operating systems, applications, utilities, compliers, interpreters, and communication programs. Computer software in this case can include any and all items used in the production of fraudulent driver's licenses; permanent resident alien documents; social security documents to include the templates that correlate to the media it is printed on.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I know that the Device has capabilities that allow them to serve as a wireless telephone, a digital camera, and a personal computer, which is capable of accessing the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file)..

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

c. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

e. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

f. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Marcus L. Moulton
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on September 3, 2019:

LAURA FASHING
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The specific items of property to be searched are as follows:

Black NUU Smart Phone:





**ATTACHMENT B**

1. All records on the Device described in Attachment A that relate to violations of Title 8, United States Code, Sections 1324 involving Eric ARELLANO including:

a. Any contact information belonging to human smugglers, both known and unknown, including phone numbers, addresses, email addresses, profile photographs, and/or false names or "nicknames";

b. Any communications, voice or text, between ARELLANO and known or unknown human smugglers, including but not limited to Steven GRIEGO, Sunshine ROMERO-Wight, Ramiro PEREZ, "EL GUERO", and the unknown female with whom ARELLANO stated he arranged to receive the illegal aliens;

c. Any and all photographs or video taken of known or potential smuggled aliens;

d. Any and all records of electronic payment information, either photographic or text-based, both sent and received;

e. Any and all photographs or video taken showing the proceeds of or benefits from the proceeds of human smuggling;

f. Any voicemail messages stored on the Device that indicate payment or knowledge of persons held against their will;

g. Any stored Global Positioning System (GPS) information used on the telephone, as well as information sent to other users regarding directions and/or GPS;

h. Any logs kept indicating or intimating payment, names, and/or locations of smuggled aliens.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.